

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CALDWELL AND PARTNERS, INC., | § | |
| as sponsor of and on behalf of the | § | |
| Caldwell and Partners, Inc. 401(k) Plan | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION No. 3:17-cv-3459 |
| VANTAGE BENEFITS | § | |
| ADMINISTRATORS, INC., JEFFREY | § | |
| A. RICHIE, WENDY RICHIE, AND | § | |
| RSM US, LLP, | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

Plaintiff **CALDWELL AND PARTNERS, INC.** ("CPI" or "Plaintiff"), as sponsor of and on behalf of the Caldwell and Partners, Inc. 401(k) Plan (the "Plan"), complains of the actions of Defendants VANTAGE BENEFITS ADMINISTRATORS, INC. ("Vantage"), JEFFREY A. RICHIE ("J. Richie"), WENDY RICHIE ("W. Richie") (collectively with J. Richie, the "Richies"), and RSM US, LLP ("RSM").

### <u>NATURE OF THE CASE</u>

1.      This suit is brought under the Employment Retirement Income Security Act ("ERISA") to remedy Defendants' breaches of their ERISA duties. Defendants' breaches have caused the Plan to suffer losses in excess of $8 million.

2.      CPI initiated this action in a District Court for the State of Texas in Dallas County, Texas, promptly upon discovering that the U.S. Federal Bureau of Investigation (the

"FBI") raided the offices of Vantage in Dallas, Texas to investigate allegations of missing retirement funds. This action was assigned to the 116th District Court of Dallas County, Texas, cause number: DC-17-15265.

3.      Upon commencement of this action, CPI obtained a temporary restraining order and emergency discovery. Through that emergency discovery, CPI learned that Vantage and the Richies committed multiple violations of their duties under ERISA.

4.      CPI now asserts its recently discovered ERISA claims in this Honorable Court.

## PARTIES

5.      Caldwell and Partners, Inc. is an Oklahoma Corporation that sponsors the Plan. CPI brings this suit in its capacity as sponsor of the Plan, and on behalf of the plan, by virtue of its fiduciary status.

6.      Defendant **VANTAGE BENEFITS ADMINISTRATORS, INC. d/b/a VANTAGE BENEFITS ("Vantage")** is a corporation formed under the laws of California, with its principal place of business at 1201 Elm Street, Suite 1600, Dallas, TX 75270. Service of process can be effected by serving Vantage's registered agent, Jeffrey Richie, at 1201 Elm Street, Suite 1600, Dallas, TX 75270 or wherever he may be found.

7.      Defendant **JEFFREY A. RICHIE ("J. Richie")** is a natural person, spouse of W. Richie, and resident of Ellis County, Texas. Service of process can be effected by serving Jeffrey Richie, at 1201 Elm Street, Suite 1600, Dallas, TX 75270 or wherever he may be found.

8.      Defendant **WENDY RICHIE ("W. Richie")** is a natural person, spouse of J. Richie, and resident of Ellis County, Texas. Service of process can be effected by serving Richie at his place of business at 1201 Elm Street, Suite 1600, Dallas, TX 75270 or wherever he may be found.

9.      Defendant **RSM US, LLP ("RSM")** is a corporation formed under the laws of Illinois, operating in Texas, with four offices and over 700 employees in Texas. Service of process can be effected by serving RSM's registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction, pursuant to: (i) 29 U.S.C. § 1132(e) (ERISA); and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction over Plaintiff's claims arising under state law).

11.      Venue is proper in the Dallas Division of the Northern District of Texas, under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in the Dallas Division of the Northern District of Texas.

12.      Venue is also proper in this the Northern District of Texas under 29 U.S.C. §1132(e)(2), because (a) the plan was administered in this district; (b) the breach took place, at least in part, in this district; (c) one or more defendants reside, or may be found, in  this district; and/or (d) process may be served on one or more defendants residing, or who may be found, in this district.

## FACTUAL BACKGROUND

13.      The Plan is a 401(k) retirement savings plan and related trust established and sponsored by CPI under the Internal Revenue Code, Sections 401(a) and 401(k), for the benefit of CPI's employees and affiliated companies (collectively the "employees" or "participants"). Currently, the Plan funds retirement benefits for over 100 "participants." Over several years, the Plan participants, apart from the actions of Defendants complained of in this Complaint,

accumulated an aggregate amount in excess of $10 million via contributed deferrals of compensation, matching employer contributions and investment earnings on the contributions to the Plan.

14.     The Plan used a Plan Year for ERISA reporting and audit requirement purposes that consisted of the twelve-month period ending on December 31.

15.      As sponsor of the Plan, CPI retained Vantage to administer the Plan, as its fiduciary plan administrator within the meaning of Section 3(16) [29 U.S.C. Section 1002(16)] of ERISA.   As the Plan's administrator, Vantage's responsibilities included providing periodic statements to the employees and to CPI, displaying (1) the participant's transaction history in each participant's account and (2) the updated Plan balance in the participant's account. For example, when a participant requested and obtained a distribution under the Plan, Vantage's Plan account statement was to reflect and record that distribution as a debit to, or subtraction from, the participant's individual account.

16.     The Plan's assets were held by a custodian and trustee: MG Trust Company, LLC ("Matrix").  Neither Matrix nor its officers or directors are affiliated with CPI.

17.     At all relevant times, J. Richie was the president and chief executive of Vantage, and exercised direct and indirect control over all actions complained of herein. J. Richie was a fiduciary at all relevant times for purposes ERISA.

18.     At all relevant times, W. Richie was the vice president of Vantage, and exercised direct and indirect control over the actions complained of herein. W. Richie was a fiduciary at all relevant times, for purposes of ERISA.

19.     CPI retained RSM to audit the Plan and report to CPI on a regular basis. RSM's audit reports covered the years, 2013 − 2016, and served as a critical means for CPI to monitor Vantage's administration of the Plan.

### *The Account Statements and Auditor Reports were Grossly False and Misleading*

20.     Following the alarming news of the FBI's raid of Vantage, CPI took emergency measures to investigate the Richies' actions, as fiduciaries of the Plan, and the veracity of account statements and the auditor reports.  To CPI's shock, ***each falsely represented the true status of the Plan's assets to obscure the fact that Vantage and the Richies had wrongfully and illegally transferred substantial sums of money from the Plan.***

21.     For example, RSM reported that the Plan had $10.4 million of assets as of Dec. 31, 2016, in a report dated Oct. 13, 2017.  RSM made this report after an audit and CPI relied on it to monitor the Plan in CPI's capacity as Plan's sponsor and fiduciary.  However, CPI has now discovered the unfortunate truth: the Plan only contained $3.960 million; over $6.6 million less than Vantage and RSM represented to CPI.

22.     As of Dec. 31, 2016, the Richies had already, wrongfully and illegally, transferred millions of dollars from the Plan.  These illegal actions continued in 2017.  ***As of Nov. 1, 2017, Vantage and the Richies illegally reduced the Plan to a mere $2,406,654.94; an amount approximately $8 million less than RSM,  as auditor, represented to be held in the trust, just two weeks prior, in the RSM audit report, dated Oct. 13, 2017.***

23.     Absent CPI's discovery of Defendants' actions, and the intervention of the Texas District Court and this Court, it is believed that Vantage and the Richies would have continued to perpetrate their illegal transfers from the Plan, and other retirement plans for which they provided administration services.  The table below summarizes  the progression and  magnitude

of Vantage's and the Richies' wrongful transfers, perpetrated on the Plan, its sponsor, and its participants:

| End of Plan Year | Reported Plan Value | Actual Plan Value |
|---|---|---|
| 2013 | $10,353,592 | $9,870,364 |
| 2014 | $10,568,864 | $9,044,169 |
| 2015 | $10,596,133 | $6,264,268 |
| 2016 | $10,405,341 | $3,960,025 |
| 2017 | NA | $2,406,654.94[1] |

***Vantage's and the Richies' Wrongful Transfers***

24.     Beginning as early as 2013, all the way through 2017, Vantage and the Richies caused hundreds of independent transfers of Plan assets from the Plan directly to an account Vantage used to operate its business (Bank of America, account number ending in …9597).  The Richies caused over 180 such transfers, totaling in excess of $5.5 million. The largest single instance appears to be on or about March 2, 2017, when the Richies transferred $985,000 from the Plan to Vantage's account in a single wrongful transaction. The Richies did not have CPI's or the Plan's consent for any such transfer, nor was CPI aware of the wrongful transfers.  In fact, the Richies intentionally concealed these transfers from CPI.

25.     The Richies caused the wrongful transfers via Vantage's computer equipment and relationship with the Plan's directed trustee and custodian, Matrix.  Specifically, the Richies, acting as the Plan's administrator and fiduciary, directed Matrix to make the illegal transfers.[2]

---

[1] As of October 27, 2017.

26.     The Richies had at least two available means to direct such transfers.  One method would result in a reporting to the Plan and to CPI via statements, while the other method operated in a manner to prevent such disclosure. The Richies used the second "under the table" method in order to avoid detection. Specifically, The Richies used a web-based form or application hosted by the Plan's trustee and custodian, Matrix, to cause the wrongful transfers of Plan assets.

27.     In a further effort to avoid their detection, the Richies supplied false information to Matrix when directing the transfers. The Richies made multiple false representations to the effect that all such transfers were for the benefit of the Plan's participants.[3]

28.     The Richies also concealed their wrongful acts by designating each wrongful transfer as one that would not be reported to the United States Internal Revenue Service ("IRS"). The Richies' "under the table" transfer method required that each transfer be designated for tax reporting purposes.  For example, many legitimate transfers were required to be reported to the IRS, under applicable laws and regulations, and such transfers would normally be designated as reportable to ensure compliance with those laws and regulations.  Such reporting would also alert the Plan's participants because they would receive a similar report at the end of the tax year. However, the Richies designated the wrongful transfers as non-reportable.  The effect of this designation ensured that no report was generated to either the IRS or the Plan's participants.  The only way such wrongful transfers could be discovered would have been 1) self-reporting by Vantage or the Richies, 2) by RSM as auditor, or 3) by Matrix, in the exercise of due care as

---

[2] Matrix was wrongfully complicit in these transfers with actual knowledge of their illegal nature under ERISA.  CPI does not name Matrix herein because the Plan's claims against Matrix may be subject to a mandatory arbitration provision.  CPI reserves all rights on behalf of the Plan to prosecute all claims against Matrix either in arbitration or a United States District Court.

[3] Despite these false representations, Matrix had actual knowledge of the illegal nature of the transfers by virtue of other inconsistent information.  CPI reserves all rights to assert its claims against Matrix and does not make any admissions herein regarding Matrix's illegal conduct.

custodian, fiduciary, and trustee. Unfortunately, the illegal transfers remained secret until the FBI opened its investigation.

29.     By way of example, the Richies transferred over $800,000.00 of assets from the Plan to Vantage's operating account during 2015 and 2016 for the purported benefit of a particular employee ("Employee A"). However, Employee A had less than $40,000.00 in his/her individual account, which the Richies knew and reported to CPI via prior account statements. Additionally, Employee A resigned as an employee in late 2014 and withdrew the entire balance of his/her benefits at that time. Nonetheless, Vantage subsequently transferred roughly $433,000.00 in 2015, and $379,000.00 in 2016, falsely representing that the transfers were distributions for Employee A. The Richies knew Employee A was not a plan participant at any time relevant to the above-referenced transfers. This fact is evidenced by their intentional selection of Employee A and deliberate failure to provide account statements for same.

30.     The Richies also wrongfully transferred plan assets they concealed with false individual employee statements on multiple occasions. As another example, the Richies transferred $340,542.71 out of the Plan's custody in 2015 and 2016, purportedly for the benefit of another employee ("Employee B"). Despite this however, the Richies falsely represented in the account statements that Vantage only debited $1,196.44 to the Plan on behalf of Employee B for the period, when in truth, the Richies actually transferred over $340,000.00 for the purported benefit of Employee B. The Richies' concealment of this fact demonstrates their awareness and intent in this wrongdoing.

31.     The Richies operated similarly on multiple occasions. For example, the Richies transferred $107,391.89 during 2015 and 2016 from the Plan for the purported benefit of another employee ("Employee C"). However, the Richies did not issue an account statement for

Employee C. Notably, Employee C was not even a participant in the Plan at the time.   The Richies' failure to provide a statement to CPI for Employee C demonstrates that the Richies knew Employee C was not a participant in the Plan.   In all probability, this may be the Richies' reason for choosing Employee C as a ruse through which their ERISA violations.

32.    The Richies transferred roughly $310,000, purportedly for the benefit of another employee ("Employee D") in 2015 and 2016, despite falsely representing to CPI that Vantage only debited the Plan $12.13 on Employee D's behalf.   Employee D was also not a plan participant in 2016, and Employee D's last Plan account balance was roughly only $12.00. As with the other employees referenced above, the Richies knew these facts and selected Employee D for the purpose of concealing their violations of ERISA and other laws.

33.    As a fifth summary example, the Richies wrongfully transferred a total of $649,262.33, via multiple transfers in 2015 and 2016, purportedly on behalf of "Employee E." The Richies falsely reported, via account statements, that Vantage debited only $135,026.40 for the benefit of Employee E in 2015, and deliberately failed provide Plan account statements for Employee E altogether for 2016.

34.    The foregoing are but a few examples of Vantage's and the Richie's multiple instances of ERISA violations.   These examples are not even necessarily the most egregious ERISA violations.   Nonetheless, a review of just these five examples demonstrates the egregious nature of Vantage's and Richie's repeated wrongful transactions and violations of ERISA:

|  | Debits Reported for 2015-2016 | Actual Transfers in 2015-2016 | Difference |
|---|---|---|---|
| Employee A | $0 | $812,172.67 | $812,172.67 |

| Employee B | $1,196.44 | $340,542.71 | $339,346.27 |
| Employee C | $0 | $107,391.89 | $107,391.89 |
| Employee D | $12.13 | $309,835.37 | $309,823.24 |
| Employee E | $135,026.40 | $649,262.33 | $514,235.93 |
| **Totals** | **$136,234.97** | **$2,219,204.97** | **$2,082,970.00** |

35.     In total, Vantage and the Richies have wrongfully transferred in excess of $5.5 million from the Plan, in over 180 separate transactions, and concealed the same via false account statements and reports.  These transfers resulted losses of over $8 million for the Plan.

## CAUSES OF ACTION

### Count I —Prohibited Transactions – ERISA Section 406 (Vantage and the Richies)

36.     CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

37.     Vantage and the Richies were Plan fiduciaries under ERISA at all relevant times. They were appointed as fiduciaries in plan documents and also acted as fiduciaries in effecting the hundreds of wrongful transfers, because they were exercising discretion or control with respect to the management of such Plan, and/or exercising any authority or control with respect to management or disposition of Plan assets, and/or exercising discretionary authority or responsibility in the administration of such Plan.

38.     As fiduciaries, Vantage and the Richies owed the Plan a duty to refrain from causing the Plan to engage in a transaction which would constitute a direct or indirect exchange or transfer of any property between the Plan and a "party in interest."   29 U.S.C. § 1106(a)(1)(A)&(D) ("Prohibited transactions").

39.     Each transfer complained of herein from the Plan to Vantage's account constituted a prohibited transaction under ERISA.

40.     Vantage and the Richies were each a "party in interest" under ERISA at all relevant times because they acted as fiduciaries, administrators, officers of a fiduciary, or relatives of another party in interest (in the case of the Richies).  Any such status constitutes a "party in interest." See 29 U.S.C. § 1002(14).

41.     Vantage and the Richies knew or should have known that each wrongful transfer constituted a direct or indirect exchange or transfer of property between the Plan and a party in interest.

42.     As fiduciaries, Vantage and the Richies also owed the Plan a duty to refrain from dealing with Plan assets in their own interest or for their own account.  29 U.S.C. § 1106(b). Each of the prohibited transfers also constituted breaches of this duty.

43.     After Vantage and the Richies wrongfully transferred the Plan's assets to Vantage's bank account, Vantage and the Richies caused the funds to be debited for the payment of Vantage's costs, or withdrawn for ultimate, illegal uses or further transfers the nature of which are still unknown.  As a result, the Plan's assets have been wrongfully depleted from an amount in excess of $10 million, to approximately $2.4 million.

44.     Plaintiffs are therefore entitled to any and all appropriate equitable or other relief for these actions by defendants, pursuant to 29 U.S.C. §§ 1109, 1132(a)(2) and 1132 (a)(3).

**Count II – Breach of Fiduciary Duty – ERISA §404(a) (Vantage and the Richies)**

45.     CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

46.     As described above, and more fully developed through discovery, Vantage and the Richies repeatedly caused the Plan to undertake transactions that constituted a direct or indirect exchange or transfer of property between the Plan and a party in interest, and/or an exchange or a direct or indirect transfer of property from the Plan to other parties with no right to a payment of Plan assets.

47.     Each such instance represents a breach of the fiduciary duties described at 29 U.S.C. §1104(a).

48.     Each such instance represents a breach of the fiduciary duty to discharge such duties consistent with the plan documents and/or the provisions of ERISA.

49.     Accordingly, pursuant to 29 U.S.C. §1132(a)(2), Vantage and the Richies are personally liable for any resulting losses to the Plan.

**Count III – Breach of Fiduciary Duty – ERISA Section 404(a)(1)(A) (Vantage)**

50.     CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.     Vantage also owed the Plan duties under ERISA to act for the exclusive purpose of providing benefits to the Plan and the employees.  Vantage owed a duty of care to carry out its duties with the care, skill, prudence, and diligence of a prudent person, under the circumstances, acting in a like capacity and familiar with such matters.

52.     Vantage breached these duties by failing to enact or comply with policies, which were reasonably calculated to prevent, detect, and deter the wrongful acts complained of herein. Further, each wrongful transfer was accomplished by employees of Vantage who Vantage failed to reasonably supervise.

53.     Additionally, by failing to perform Plan-administrative services for which it charged the Plan, and which would have deterred or arrested the wrongful acts recited above, Vantage charged fees to the Plan that were excessive and unreasonable.

54.     As a result of Vantage's breaches of its fiduciary duties, the Plan suffered losses, including (without limitation) diminished plan assets and lost earnings in an amount to be shown at trial. Vantage is liable for these losses pursuant to 29 U.S.C. § 1109.

55.     Alternatively, Vantage is liable to disgorge any excessive and/or unreasonable fees charged to the Plan, pursuant to 29 U.S.C. §1132(a)(3).

### Count IV – Equitable Relief Pursuant to ERISA §502(a)(3) (All Defendants)

56.     CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57.     Alternatively, and whether a particular Defendant participated as a fiduciary or non-fiduciary in any breach or other activity violating the provisions of ERISA, each of those Defendants is liable for appropriate equitable relief, including (without limitation) restitution of Plan funds improperly removed, a constructive trust over all such funds still in Defendants' possession, and/or disgorgement of service fees or other profits derived from Defendants' actions or omissions.

### Count V – Negligent Misrepresentation (against RSM)

58.     CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     RSM made representations and rendered professional opinions to the Plan and to CPI in the course of its business as an accounting firm.  By way of example, RSM gave opinions on a regular basis to and for the Plan in the form of audit reports.  RSM received

valuable compensation in exchange for gathering information regarding the Plan, auditing it, and giving an opinion on the financial status of the Plan.

60.     RSM provided this information for the guidance of CPI as the sponsor of the Plan. CPI justifiably relied on the information.

61.     RSM supplied false information to CPI, both by making misstatements of fact and failing to disclose information it had a duty to disclose.  RSM provided communications it titled "Independent Auditor's Reports" for the calendar years of 2013-2016 (the "Auditor Reports").

62.     Each of these reports contained similar and multiple false representations:

a.   RSM falsely represented the value of net assets available for benefits;

b.   RSM falsely represented the amount paid in benefits and administrative expenses;

c.   RSM falsely represented the amount the Plan's assets decreased or increased from each prior year;

d.   RSM falsely represented that the asset valuation summarized in footnotes that were part of the Reports was "prepared or derived from information certified or provided by the custodian;"

e.   RSM falsely represented in footnotes  that were part of the Reports that "the Plan Administrator has obtained certifications from the custodian that the information provided to the Plan Administrator by the custodian… is complete and accurate;" and

f.   RSM falsely represented in footnotes, included in the Reports, that "[t]he custodian also certified to the completeness and accuracy of [the amount] of net appreciation in fair value of investments and [the amount] in interest and dividends for… [each year]."

63.     Each of the Auditor Reports failed to disclose multiple pieces of information that RSM had a duty to disclose, including (without limitation) the following:

a.  RSM failed to disclose that the Richies were making wrongful transfers of Plan assets; and

b.  RSM failed to disclose that the Richies were purporting to make transfers on behalf of multiple persons who were not Plan participants.

64.     RSM failed to exercise due care and/or competence in formulating and/or communicating each of the above misrepresentations and omissions. RSM's negligent misrepresentations proximately caused the Plan harm because CPI was not able to detect the wrongful transfers of Plan assets that Vantage and the Richies were perpetrating.

65.     CPI is also entitled to exemplary damages because RSM's misconduct constitutes gross negligence.  When viewed objectively from RSM's standpoint, its misrepresentations involved extreme degree of risk, considering the probability and magnitude of potential harm to others.  RSM knew CPI and the employees were relying on its Auditor Reports to monitor the Plan.  RSM had actual, subjective awareness of the risk that the information was misleading or incomplete but proceeded to make the representations within the Auditor Reports with conscious indifference to the rights or welfare of the Plan, the employees, the dependents of the employees, and CPI.

### Count VI – Equitable Estoppel under ERISA Sections 502(a)(3) and 514

66.      CPI repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     RSM learned of the wrongful transfers in the course of auditing the Plan.  Despite its knowledge of the wrongful transfers, RSM nonetheless concealed them by making the

misrepresentations complained of herein.  Such acts constituted "knowing participation" by RSM in Vantage's breaches of ERISA fiduciary duties.  As such, the Plan is entitled to appropriate equitable relief against RSM, pursuant to 29 U.S.C. 1102(a)(3), to redress the ERISA violations CPI complains of.  *See Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

68.     CPI seeks a declaration, estopping RSM from enforcing any purported contractual limitation of liability for its wrongful conduct in connection with CPI and the Plan. ERISA fiduciaries may not contractually limit their liability under ERISA.  See 29 U.S.C. § 1110. RSM's knowing participation and the principles of equity require that RSM be similarly prohibited from contractually limiting its liability in this instance. Such a declaration is necessary to fulfill ERISA's express policy to "protect… the interests of participants in employee benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).

69.     CPI further seeks a declaration invalidating any purported contractual limitation of liability for RSM under 29 U.S.C. § 1144.  Insofar as the purported contractual liability limitation would operate to abrogate, alter, or mitigate liability for breaches of the duties imposed by Section 29 U.S.C. 1102(a)(3), the same is superseded and preempted by ERISA.

## JURY TRIAL

70.     CPI hereby respectfully requests an expedited trial by jury to fullest extent permissible.

## DEMAND FOR RELIEF

Based on the foregoing, CPI demands judgment against Defendants jointly and severally, as follows:

WHEREFORE, CPI prays that the Court grant the following relief:

1.      An Order, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), compelling Defendants to make good to the Plan all losses resulting from their breaches of ERISA fiduciary duties, including without limitation any diminishment in the Plan's assets and any lost earnings thereon;

2.      Disgorgement of all profits obtained by Defendants in providing services to the Plan, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), and/or ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3);

3.      Estop RSM from enforcing any purported contractual liability limitation;

4.      Award Plaintiff compensatory damages on any claims made pursuant to state law;

5.      Award Plaintiff punitive damages on claims made pursuant to state law;

6.      Award Plaintiff their reasonable attorneys' fees and expenses and court costs;

7.      Award Plaintiff pre-judgment and post-judgment interest as allowed by law;

8.      All other relief to which Plaintiff is entitled, in an amount to be proven at trial; and

9.      Such other relief as the Court deems just and proper.

Respectfully submitted,

MCCATHERN P.L.L.C.

/s/ Arnold Shokouhi
Arnold Shokouhi
State Bar No. 24056315
arnolds@mccathernlaw.com
Justin Bryan
State Bar No. 24072006
jbryan@mccathernlaw.com
Shane Eghbal
State Bar No. 24101723
seghbal@mccathernlaw.com

3710 Rawlins, Suite 1600
Dallas, TX 75219
Telephone:  (214) 741-2662
Facsimile: (214) 741-4717

**ATTORNEYS FOR CPI**